Joseph F. Hawkins, J.
The two actions herein have been consolidated and were so tried. In the first action, the three plaintiffs are the surviving sisters and sole distributees of the decedent, and the latter is brought by the plaintiff, Hilda Daniels, as administratrix of the estate of Naomi Ham, deceased. Both said actions seek to set aside a deed from the decedent to the defendant and to cancel all subsequent liens and encumbrances imposed upon the real property, the plaintiffs alleging that the said deed was obtained by the defendant by his exercising undue influence and, also, that the decedent lacked the requisite mental capacity at the time she executed the deed.
The decedent and the defendant, although they were not married, had known each other for some 28 years. The defendant, separated from his wife for some 24 years, most tactfully described his relationship.with the decedent as “like husband and wife ” and, referring to the decedent, stated “ she was as a wife. ’ ’
The property in question is a home located in New Rochelle, New York, which originally was acquired on September 12, 1961, by conveyance to and in the sole name of the defendant. The defendant testified that his wife, upon learning of her husband having acquired the real property, threatened that upon his death she would evict the decedent. Upon realizing that his estranged wife would have a claim to the property and to protect the decedent, the defendant, on November 30, 1961, conveyed the property to her. There seems to be no question that the defendant supplied the consideration for the property for the initial conveyance from his own funds and that over the years, he made the requisite payments on account of amortization, interest, etc.
The decedent died intestate on June 15, 1967. On May 26, 1967, defendant brought the decedent to the hospital. Several days thereafter, on June 6, 1967, she underwent surgery, but the operation revealed that the decedent, unfortunately, was “seeded” with cancer and, as previously noted, died shortly thereafter.
The plaintiff, Hilda Daniels, testified that she was a sister of the decedent; that she had visited her sister in the hospital *577 every day; that she had been informed by Drs. Jordan and Robert F. Morton, who had attended her sister, that the patient was declining rapidly; and that her prognosis was severely guarded. This witness also testified that a Mrs. Angelina Baio was a patient who shared the hospital room with the decedent.
The plaintiff, Dorethea Williams, also testified to visiting her sister and that she saw her on June 13, 14 and 15, on which occasions the decedent was in extremis.
Dr. Robert F. Morton, the surgeon, testified that he had operated on Naomi Ham on June 6, 1967. This patient had been referred to him by Dr. Jordan, who believed there were tumors in the bloodstream and seeded cancer in the abdominal area and that the operation confirmed such diagnosis. This physician testified that prior to her admission, decedent had had high blood pressure; that various types of drugs had been administered to alleviate her pain, with some seven different drugs being administered, including Demorol, and intravenous fluids and blood restoratives. He further testified that such drugs resulted in a lesser blood flow to the brain but that there is no medical certainty as to the effects upon the patient in terms of her orientation and lucidity since such consequences depended upon the particular person involved. He did, however, testify that the decedent was disoriented at times, but also lucid on occasion, and that her severe discomfort and episodes of disorientation resulted from the severe vomitting rather than from the drugs or the medication. Upon seeing his patient on June 12 — the date the acknowledgment was taken — although drowsy and sleepy, she was neither unconscious nor partially disoriented.
The patient who shared the room with the decedent, Mrs. Angelina Baio, testified that she recalled that the decedent twice fell out of bed. There was virtually no conversation with these two patients; but she did recall seeing the defendant visiting the decedent on several occasions; that there was a conversation relating to an automobile license which she recalled; and that she saw decedent sign some papers which she gave to the defendant. This witness’ recollection was that the decedent signed some paper, which appeared to be small and ‘c something like a card. ”
The last witness on behalf of the plaintiffs was Mrs. Hanna F. Sulner, an ‘ ‘ examiner of questioned documents. ’ ’ She testified that she had so qualified since 1950, in New York, and that prior thereto had had considerable training and experience in this field in Hungary. She submitted various lists attesting to her qualifications and stated that she had testified in various State and Federal courts as an expert on questioned documents.
*578 This witness concluded, based upon her examination of the signature of the questioned document and comparing the signature to the several standards consisting of checks, bills, etc., which had been signed by the decedent, that the signature was not a forgery; that it had not been done by tracing or by someone who practiced duplicating the decedent’s signature. It was her opinion, however, that the decedent at the time she signed the deed was “present in body, but not in mind;” further, that at the time of signing the deed, she was not of sound mind and did not know what she was doing.
This expert witness never met the decedent. Her opinions were based solely upon her examination of the various samples of the decedent’s signature and a blow-up of the signature on the deed. Premised upon her assertions that handwriting is related to brain function and that if the brain is affected the handwriting would also be affected, the decedent’s lack of mental capacity is indicated by omissions and repetition, *‘ transposition of letters, incorrect spelling ” and “ unreadable scribbles ” and “ flourishes. ”
Apart from the testimony of the defendant to which we shall allude later, a friend of the decedent for many years, Mrs. Mary Schapanick, testified that they had first met in 1960; that they had worked together in the same establishment for many years; and that they had ridden to work together daily. This witness stated that she had visited the decedent at the hospital the day before the operation and the late afternoon of June 13. On that occasion, this witness testified she saw the patient for some 10 minutes and that the decedent had recognized her and that they had conversed together. This conversation occurred in the presence of two of the decedent’s sisters, the plaintiffs herein, who were at the hospital at that time.
The defendant testified that he had known Naomi Ham, the decedent, for some 28 years; that he had been married in 1929 and has been living apart from his wife for some 24 years. There was never any legal separation and, in fact, he is still legally married. He further testified that since 1935, he lived in New Rochelle and that on September 12, 1961, he purchased the premises in issue. The defendant further testified that he had paid $23,000 for the property, of which $2,300 was in cash on deposit, $15,000 on a bank mortgage and, additionally, there were a purchase-money second mortgage and a third mortgage. He further testified that he made all the payments on the mortgages prior to decedent’s death and the decedent did not contribute to these payments.
*579 Respecting the execution of the deed, he testified that he took decedent to the hospital on May 26, 1967; and that very day, prior to leaving their home, she had signed the deed and delivered it to him. Thereafter, he took the deed to his attorney’s office and left it with the attorney’s secretary so that it could be recorded. He further testified that he had contributed some $714 for the decedent’s funeral.
H. Hawthorne Harris, Esq., the defendant’s attorney, took the stand and testified that the deed, dated June 12, 1967, had been prepared by him; that he went to the hospital on June 12 to see the decedent and that she acknowledged to him at the New Rochelle Hospital that the signature was, indeed, hers; he further testified that the deed had been left at his office, as testified to by the defendant, on June 9; that it was undated and that subsequent to his visiting the decedent at about 4:00 p.m. on June 12, the date was inserted and he notarized the instrument. He further testified that on the occasion of his seeing the decedent at the hospital, she recognized him, was lucid, spoke about her pain and discomfort, and informed him that she had, indeed, signed the deed ‘ ‘ for Dennis. ’ ’
The burden of proof is, of couse, upon the plaintiffs who assert the invalidity of the recorded instrument. TJpon the plaintiffs’ submission, there is here lacking the requisite fair preponderance of credible evidence to establish that the defendant either exercised undue influence or that the decedent lacked sufficient mental capacity to execute the deed. The relationship which endured for so many years between the decedent and the defendant, their prior exchanging of deeds, coupled with the decedent’s understandable concern that the defendant be restored to title if the untoward occurred, sufficiently explain the decedent’s motives in deeding the property back to her grantor.
Significantly, the attending surgeon, Dr. Morton, ventured no opinion either as to the decedent’s lucidity or disorientation at the time of the acknowledgment. It should be further noted that the issue here is not necessarily the decedent’s state of mind at the time she acknowledged her signature to the attorney but rather her state as of the date she executed and delivered the deed, which the defendant testified to was at her home prior to departing for the hospital. Absent an opinion based upon reasonable medical certainty by Dr. Morton as to his patient’s mental condition on the date of the acknowledgment, the plaintiffs have failed to overcome the presumption of mental competency.
*580 The only other “expert evidence” submitted on behalf of the plaintiffs as to the decedent’s alleged mental incapacity was that provided by the examiner of questioned documents. Inexplicably, the defendant did not object to such testimony; nevertheless, the court must determine how much credibility, if any, is to be accorded to all or part of her testimony. I accept and give credence to that testimony only to the extent that this witness testified that the signature on the deed was genuine. Indeed, under existing law that is the permissible and acceptable limits for such testimony. As noted in Bichardson, Evidence (9th ed., § 392): “ An expert’s testimony should be confined to comparing the disputed and conceded writings, and giving an opinion as to whether they were written by the same person. He cannot testify directly as to the genuineness of the signature in question. People v. Severance, 67 Hun 182, 22 N. Y. S. 91. ”
As to the judgments and opinions respecting the decedent’s mental condition, this witness testified: “ I am absolutely definite that this signature was obtained under conditions when the testator \sic] was only present in body but not in mind, that she did not know what she is doing and she was not of sound mind. ” These are medical, psychiatric findings and judgments wholly beyond this witness’ competence. In pronouncing such gratuitous conclusions, she leaped into the occult, esoteric, pseudoscientific pursuit known as graphology, venturing far beyond the province of a handwriting expert. These conclusions, it should be noted, were based merely upon the signature in question and several other signatures by the decedent made prior to her hospitalization.
Albert S. Osborn in his authoritative text, Questioned Documents Problems, cautioned against accepting such testimony, stating (p. 34): ‘1 There is a prevalent notion that the document specialist can do the impossible which idea has arisen from the overdrawn, sensational and unscientific articles in magazines that are not recitals of the facts in actual cases. Of course there are in many cities presumptuous graphologists, or handwriting fortune tellers, who undertake to answer many of these difficult questions by describing from the writing alone the person who wrote it. This mere guess fortunately does not get into the official stenographer’s notebook in this country. ”
The defendant’s failure to object is the exception to the situation, projected in the last sentence of the above quotation.
We agree with the several caveats against graphologists being-permitted so to testify and the attendant problems stated by *581 Osborn (supra, p. 351): “ If general human character qualities could be correctly inferred from all these variations, then what is called graphology would indeed be a science, but when the graphologist connects with a particular single quality a definite character value, the unscientific and ridiculous nature of the performance is readily seen. Writing does indicate manual skill and certain artistic qualities, or lack of them, but does not show honesty, or dishonesty, or disease and other important phases of human nature. ’ ’
How little weight, if any, a court should accord to these practitioners is well noted by Wilson B. Harrison, in his work entitled Forgery Detection — A Practical Guide. For some 26 years, that author was the director of the British Home Office Forensic Science Laboratory at Cardiff, where documents were examined for the police forces of England and Wales. In discussing what, if anything, can be deduced respecting so-called personality traits from handwriting, he states (p. 156): “ Even those graphologists who profess to be capable of telling so much about the personality and abilities of the writer from their examination of a few written characters, refuse to commit themselves about the sex of the writer even when pages of handwriting are put at their disposal. The uncharitable suggestion once made by the author that this is because their conclusions can in these particular instances be tested for accuracy, has resulted in a storm of abuse being rained on his head! ’ ’
The definition of graphologist by this authority on handwriting contained in questioned documents is well worth noting: ‘ ‘ ‘ Graphologist ’ is the term which is generally restricted to the person who claims to be able to deduce from a specimen of handwriting — sometimes but a single signature — a host of information concerning the character and abilities of the writer. It cannot be denied that the activities of any person, be they speaking, writing, walking, etc., are governed entirely by his physical and mental make-up but, in the opinion of the author, this is no warrant for asserting that, from a tiny aspect of any one activity, anyone, no matter how gifted, has the ability to make an accurate appraisal of the mental and physical features which governed that particular activity selected for study. ’ ’ (p. 189).
The language in Mr. Harrison’s prior text on the subject Suspect Documents — Their Scientific Examination, published in 1958, places this particular pursuit in its proper context. Quoting from page 1: “ ‘ handwriting experts ’ and ‘ graphologists ’ in general have enjoyed a very low status in the courts. *582 The general and usually well-justified feeling has been that their findings are largely intuitive and that consequently there are often as many opinions as there are experts in the case. ”
The definition contained in Webster’s, Third International Dictionary, 1966, defines graphology as ‘ ‘ the study of handwriting esp. for the purpose of character analysis [if taken away from fortunetellers . . . — may yet become a useful handmaiden of psychology — Time]. ”
We are not unmindful that graphology has long enjoyed a certain vogue in Europe, including such devotees as Goethe, Leibniz and the Brownings (Saudek, The Psychology of Handwriting, p. 11); but this court’s research has failed to reveal any adjudication in which judicial sanction has been accorded such speculations and deductions based upon a mere signature. Parenthetically, the court acknowledges its obligation to Anthony P. Grech, Esq., Librarian of the Association of the Bar of the City of New York, to whom we turned for aid in researching the problem and whose scholarly instincts were piqued by its novelty. His research, although directing our attention to some of the texts above cited, has similarly been unyielding in terms of case law.
To allow such testimony — or, if received in the absence of due objection — is to open the floodgates to speculative testimony devoid of genuine scientific foundation. The endeavors by courts and juries in fact finding processes would not be aided by granting judicial sanction to graphologists; on the contrary, they would be stultified and shunted into a mystical miasma.
The complaints are dismissed, the plaintiffs having failed to establish by a fair preponderance of the credible evidence that the defendant exercised undue influence upon the decedent or that the decedent lacked the requisite mental capacity to execute and deliver a deed.