STATE of Minnesota, Respondent,

v.

Steven Todd ANDERSON, f.k.a. Steven Todd Jenkins, Appellant.

No. C4–84–964.

Supreme Court of Minnesota.

Dec. 13, 1985.

C. Paul Jones, Anne Lewis, Minnesota State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael W. Cable, Lincoln County Atty., Ivanhoe, for respondent.

## OPINION

WAHL, Justice.

Steven Todd Anderson, formerly known as Steven Todd Jenkins, was convicted of the first degree murder[1] of Rudolph Blythe and the second degree murder[2] of Deems Thulin, by shooting. The trial court sentenced him to consecutive terms of life imprisonment and 116 months imprisonment. He appeals from this judgment of conviction and sentence, contending there is insufficient evidence that he killed Blythe and Thulin or that Blythe's killing was premeditated. He also claims he was denied due process and a fair trial by various court rulings and by the court's failure to sequester the jury during deliberations. We affirm the convictions.

The tragedy occurred on the morning of September 29, 1983, when Rudolph (Rudy) Blythe, president of the Buffalo Ridge State Bank of Ruthton, Minnesota and Deems (Toby) Thulin, loan officer, drove to an uninhabited farm owned by the bank to meet a man they believed to be a prospective buyer for the property. They were shot and killed at the farm. The only other people on the property at the time of the shooting were Steven and his father, James Jenkins.

Steven's parents, James and Darlene Jenkins, had owned the farm, located between Ruthton and Tyler, and had run a small dairy operation there from 1977 to 1980. They had pledged the property as security for a 1979 farm operating loan from Buffalo Ridge State Bank. In 1980, James and Darlene Jenkins divorced, defaulted on the loan and declared bankruptcy. The family abandoned the property shortly thereafter and title passed to the bank. After the divorce and loss of the farm, Steven lived on and off with his mother or his paternal grandparents in Minnesota and with his father in Minnesota, Ohio and Texas. In May, 1983, he returned from Texas to Minnesota and his father followed several months later.

Father and son planned to begin dairy farming in Minnesota again. They rented a small farm near Hardwick in Rock County. During the months before the murders, James Jenkins sought financing or credit for the proposed operation from many lending institutions and cattle lessors, but credit was repeatedly denied. On September 28, 1983, Jenkins' final effort to negotiate the credit purchase of dairy cattle from a Long Prairie cattle dealer failed. Steven said his father blamed his inability to get credit on the 1980 bankruptcy and on banker Rudolph Blythe who, he believed, was giving him bad credit references. Susan Blythe, vice president of the bank and Rudolph's wife, confirmed that her husband had told prospective lenders about Jenkins' bankruptcy when they asked for a credit reference.

After being refused credit by the Long Prairie cattle dealer, James Jenkins telephoned Blythe at the bank and, posing as a potential buyer named Ron Anderson, arranged to meet Blythe at the old Jenkins' farm at 10:00 a.m. the next morning, September 29. Steven testified before the grand jury that his father told him, "we were going to go there and rob [Blythe] and scare him, scare the hell out of him." Steven understood the plan included him.

Steven and his father left home in their pick-up truck early the next day for the

---

1. Minn.Stat. § 609.185(1)

2. Minn.Stat. § 609.19(1)

10:00 a.m. appointment, with Steven driving. In the truck were four guns (a 12 gauge shotgun, a modified .410 shotgun, a .22 caliber pistol, and the gun later identified as the murder weapon, an M–1 semi-automatic rifle) some ammunition, two knives, three defused hand grenades and assorted military equipment, all belonging to Steven. Steven said he habitually stored the weapons in the cab of the pick-up truck with the exception of his M–1 rifle, which he kept in the corner of his room at night and took with him in the truck whenever he left the house.

The two arrived at their old farm at 8:30 a.m. and parked in the farmyard in front of the garage. A diagram of the farm is attached to this opinion as Appendix 1. James began removing the truck's front license plate. Steven took three guns from the truck, placing the .22 pistol on the seat, and the M–1 rifle and 12-gauge shotgun within reach on the hood of the truck. As James bent to remove the truck's rear license plate, father and son unexpectedly heard a car coming up the farm driveway. It was still long before 10:00 a.m., when Rudy Blythe was expected. Each, with a gun, ran and hid, Steven behind the garage. The location of James Jenkins during the ensuing incident was not determined at trial. Blythe's green station wagon pulled up the driveway and parked nose-to-nose with the Jenkins' white pick-up truck. Rudy Blythe and Toby Thulin got out of the car and began looking around, shouting "who is here?" Within minutes, a second car, driven by Susan Blythe, Rudy's wife, pulled into the farmyard. Susan had come to the farm to exchange cars with her husband. Rudy told her he thought the white truck belonged to the Jenkins. Susan stood for a few minutes next to her parked car talking with Toby Thulin. As she talked, she watched her husband walk past the station wagon, past the truck and along the west side of the garage toward a grove of trees that grew behind the building. She marked the most distant point of her husband's path by a ground depression that dropped from the end of the garage to the grove. She described seeing Rudy

"walk down into a hole * * * I saw him kind of drop off." He did not appear to see anyone, however, and returned to where all three vehicles were parked. While Rudy had been investigating, Susan Blythe heard what she described as a "metallic, creaking kind of sound," a sound which she later identified as the rattle of old rain gutters, piled in the weeds behind the chicken house to the east and back of the garage, when someone stepped on them. When Rudy Blythe returned to the car, he told his wife to go get the sheriff because there were trespassers on the property. As Susan Blythe drove away towards the nearest town, she saw her husband once again in the garage-grove area and Toby, walking east away from the station wagon, looking around.

Steven maintained, in grand jury testimony admitted at trial, that he remained hiding behind the garage during these events and saw neither his father nor the victims until after the shootings, though he did hear somebody say "something about going to get the police" and one car leaving. Almost immediately after Susan Blythe drove away, however, three shots were fired at Blythe and Thulin at their car, killing Thulin instantly and wounding Blythe. Blythe fled towards the farmhouse front yard and the killer followed. Blythe was shot four times and fatally wounded as he tried to reach the road. He apparently died within a few minutes.

Steven and his father fled the farm immediately after the shootings. Paul Bartz, passing by the old Jenkins farm on County Road 7 at about 9:00 a.m., turned his truck around to investigate a flash of yellow, which turned out to be Blythe's jacket, in the ditch beside the road. He saw a white Chevy pick-up with a rear Texas license plate "screaming down the driveway." After leaving the farm, Steven and his father drove to Luverne, bought more ammunition, gasoline and a flashlight, and started for their home in Hardwick. On the road they encountered a Rock County deputy sheriff, Ronnal McClure, who turned around and began following them closely.

Steven said his father told him to get out and shoot at the policeman. They turned the truck onto a gravel road, Steven got out with the M–1 rifle and shot three times at McClure's car as it passed the intersection. McClure lay down in the seat, accelerated past the intersection and was not hit.[3] Without returning home, Steven and his father drove into South Dakota and on to Texas, driving at night to avoid police detection. They arrived at Paducah, Texas on Saturday, October 1, 1983. On Sunday, October 2, Steven left his father at the abandoned farm where they were hiding and surrendered to Paducah police, saying he was wanted in connection with some murders in Minnesota. Sometime Sunday night James Jenkins shot himself in the head and died on a county road leading to the abandoned farm.

Steven was brought back to Minnesota in custody. After consulting with his attorney, and being fully advised of his rights by the state's attorney, he gave his version of the shooting and surrounding events to the grand jury. The grand jury returned a six count indictment, charging Steven with:

Count 1: the intentional, premeditated death of Rudolph Blythe, Minn.Stat. § 609.-185(1) (Murder in First Degree);

Count 2: the intentional death of Rudolph Blythe while committing or attempting to commit aggravated robbery, Minn. Stat. § 609.185(3) (Murder in First Degree);

Count 3: the intentional death of Rudolph Blythe, Minn.Stat. § 609.19(1) (Murder in Second Degree);

Count 4: the intentional death of Deems Thulin, Minn.Stat. § 609.19(1) (Murder in Second Degree);

Count 5: aiding, advising and conspiring with another in causing the death of Rudolph Blythe while committing or attempting to commit a felony offense against Blythe, where that death was a reasonably foreseeable consequence of the attempted felony, Minn.Stat. § 609.19(2), and 609.-05(1)(2) (Murder in Second Degree);

Count 6: aiding, advising and conspiring with another in causing the death of Deems Thulin while committing or attempting to commit a felony offense against Thulin when that death was a reasonably foreseeable consequence of the attempted felony, Minn.Stat. §§ 609.19(2) and 609.05(1)(2) (Murder in Second Degree).

Steven was tried in Ivanhoe before a Lincoln County jury. He had requested, in two separate pre-trial pleadings, "that all hearings, trials [and] pre-trials be without exception held in Lincoln County in the Ivanhoe Courthouse and nowhere else." The jury found Steven guilty of Count 1, the intentional, premeditated murder of Rudolph Blythe and of Count 4, the intentional murder of Deems Thulin.

This appeal raises the following issues:

(1) Whether the evidence was sufficient to identify defendant as the person who killed Rudolph Blythe and Deems Thulin;

(2) Whether there was sufficient evidence of premeditation in the killing of Rudolph Blythe;

(3) Whether the trial court improperly excluded expert psychiatric testimony, polygraph test results, a graphological personality assessment and certain evidence of James Jenkins' character from evidence;

(4) Whether the trial court erred in denying a defense motion for a *Schwartz* hearing based on allegations of jury influence, in violation of defendant's right to a fair trial by an impartial jury; and

(5) Whether the trial court's failure to sequester the jury during its deliberations denied defendant a fair trial by an impartial jury.

1. Steven first challenges the sufficiency of the evidence, arguing that the state did not prove beyond a reasonable doubt that he was the person who killed Rudy Blythe and Toby Thulin. Throughout the murder investigation and trial, he main-

---

**3.** Steven pled guilty in Rock County to a charge of second degree assault, Minn.Stat. § 609.222,

in connection with this incident.

tained his father, not he, was the killer. No other witness to the shootings lived to testify. The state's evidence identifying Steven as the killer was circumstantial.

██ A conviction may be based on circumstantial evidence and will be upheld if the "reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *State v. Threinen*, 328 N.W.2d 154, 156 (Minn.1983) citing *State v. Kotka*, 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied* 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968). A conviction based on circumstantial evidence may stand "only where the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). Despite the stricter standard of review raised by a murder conviction based on circumstantial evidence, a jury is in the best position to evaluate the circumstantial evidence surrounding a murder and the jury verdict must be given due deference. *State v. Linder*, 304 N.W.2d 902, 906 (Minn.1981).

It is not disputed that two people were murdered at the old Jenkins' farm and that Steven and his father were at the farm when the murders occurred. Steven himself told the grand jury he went to the farm, armed and prepared for some violent encounter with Blythe and admitted fleeing with his father after the murders and shooting at a deputy sheriff to aid their escape. When he surrendered to Texas authorities, he acknowledged he was wanted in connection with some murders in Minnesota.

The state presented extensive physical evidence at trial describing the features of the farm and the evidence left from the murders. This evidence enabled the jury to reconstruct the sequence of events and determine the credibility of Steven's version of the incident. This presentation included video tapes and slide photographs of the farm, the location and position of the bodies and the shell casings at each shooting site; laboratory analysis of bullets recovered from the bodies and the Blythe car; a reconstruction of the observations of witness Susan Blythe; a reconstruction of shots being fired from the first shooting site into the Blythe car with the murder weapon; autopsy reports and laboratory analyses of the victims' clothing; and the murder weapon and analyses of test firings.

The physical evidence indicates that almost immediately after Susan Blythe drove away from the farm to fetch the police, a gunman stepped from behind the chicken house and fired three shots from the M–1 semi-automatic rifle at Blythe and Thulin, who had returned to the station wagon, quickly, it would appear, because they were heading away from the car in opposite directions as Susan left. One bullet entered the front passenger side window vent and hit Thulin in the neck, severing his spinal cord and killing him instantly. A second bullet lodged in the car door on Thulin's side. The third went through the front windshield, through the open driver's side window and hit Blythe in the lower back as he crouched beside the driver's-side door. This wound was not fatal nor did it seriously impair Blythe's ability to run or walk for he appears to have moved 90 yards west from the car after these first shots. Blythe's path led through the farmyard, along a sidewalk south of the farm house and across the front yard. The second set of four shots hit him as he went into a shallow ditch that separates the front yard from County Road 7. He was hit by all four bullets, shot from approximately 90 feet away, where four shell casings were found. The marksman had also moved 90 yards from the first shooting site. Two bullets hit Blythe in the side, very close together, causing fatal wounds. Another bullet hit Blythe's arm, the fourth passed through his jacket. Blythe apparently died within minutes.

The state at trial extensively explored the physical evidence of the murders in light of the respective marksmanship and physical capabilities of Steven and his father to determine which of the two *could* have committed the murders. There was evidence of how the murder weapon operated and malfunctioned; evidence of the interest, experience, training and skill of both men in handling and shooting guns, particularly the murder weapon; and evidence of the physical condition of both, including eyesight and ability to run.

The murder weapon was an M–1 series semi-automatic rifle. There was evidence the gun often failed to operate semi-automatically; after firing, the used shell would not eject, but would "jam" the chamber, blocking the new shell. This jamming problem had been corrected the previous winter but the gunsmith testified the problem was a recurring one because of a manufacturing defect. According to a hunting friend of Steven's, the gun was jamming in the summer of 1984 and Steven himself stated that the gun jammed on the day of the murders when he shot at Officer McClure's squad car. BCA agents, testing the gun after the murders, found that it persistently jammed in test firing. A semi-automatic that jams can still be operated by manually clearing the chamber after firing. This manual operation is slower than semi-automatic function. Because manual operation is slower, the killer's demonstrated ability to shoot quickly and accurately indicated both expert ability and familiarity with the operation of this particular weapon.

Steven owned the murder weapon and had been trained to shoot it by a 31-year Army veteran, Charles Snow, Steven's boss in Texas. Snow, who had once seen Steven dance a tin can across a pond with the weapon, testified that Steven was a "superb" marksman. Snow also taught Steven the military skill of shooting accurately after running a distance, a skill Steven worked at perfecting by frequent practice. In the months before the murder, after his return to Minnesota, Steven had shot at least 500 rounds in target practice with the

gun, indicating familiarity with the M–1's malfunction as well as its usual operation. He was attached to the murder weapon and kept it near him at all times. He was also deeply interested in the military and habitually wore military fatigues and a military-style haircut. He owned several weapons and other military equipment, such as defused hand grenades, etc. and often asked older men in his acquaintance about weaponry, explosives and military experiences. Steven was an 18-year-old in good physical condition at the time of the murders.

James Jenkins, on the other hand, was 46 years old and physically limited by impaired eyesight and a resulting slowness and hesitancy in his movement. The father suffered from retinitis pigmentosa, a progressive disease causing "tunnel vision," night blindness and, eventually, complete blindness. His corrected vision was 20% of normal in his right eye (the eye with which he would aim a weapon) and 63% of normal in his left eye. While Jenkins could see well enough to work, hold a driver's license and drive during the day, there was evidence his poor vision limited his mobility and made sighting and shooting a gun difficult. Recent associates described him as walking "oddly," as if he had to feel his way along the ground with his feet. There was testimony his eyesight had recently prevented him from being able to use a mechanical gunsight like that on the murder weapon. In addition, Jenkins had not owned or shot a gun with any frequency for several years, although he may have received training to shoot an M–1 rifle while in the National Guard twenty years earlier. Steven said his father had practiced target shooting only a few times in the last 2–3 years and did not share his son's interest in guns. Jenkins' friend in Texas said he once saw him try to sight a shotgun, but he couldn't focus, and said, "I can't see anything through it." Jenkins refused a deer hunting invitation from this friend, claiming poor eyesight. Jenkins borrowed a shotgun for use in guard duty at his job in Texas, but returned it the next day, saying "I don't want to carry it be-

cause if I used it I would get myself killed."

Physical evidence of the murders indicated the killer shot quickly and with great accuracy. Thulin was killed by one bullet through the neck. Then the killer chased Rudolph Blythe for 90 yards and shot again, hitting his target with all four bullets and placing two of those bullets, the fatal shots, within 1 to 1-½ inches of each other. There was evidence running and shooting diminishes the accuracy of marksmanship and the less fit the shooter, the greater the impact of this strenuous maneuver. Faced with this evidence, the jury could well have been forced to conclude, even against their natural sympathies, that Steven, who was young, agile, skilled at running then shooting, and an expert marksman with the M-1, had shot Blythe and Thulin rather than his father, who had limited mobility, a serious visual handicap and rarely handled guns.

The jury was also confronted with the contradictions between Steven's version of events at the farm and Susan Blythe's testimony. Steven claimed he hid behind the garage throughout the shootings and did not see the victims or his father until the murders were over. Susan Blythe, in her testimony, described her husband as walking past the end of the garage, where Steven said he was hiding. The BCA reconstruction of Susan's description confirms that Rudy, in looking for trespassers, could have been seen along the north end of the garage where Steven claimed to be hiding. Steven also said he did not hear the metallic noise described by Susan Blythe, even though his position behind the garage was closer to its source, the pile of rain gutters behind the chicken coop, than was hers. The conflicts between their testimony are significant. If Steven was behind the garage, he would have seen Rudy walk past the building and into the grove. If he did not, it seems likely Susan Blythe's "metallic noise" was made by his stepping on the rain gutters as he ran from behind the garage around the chicken coop to avoid being seen by Rudy as he investigat-ed. The first set of shots was fired from the corner of the chicken coop.

Susan Blythe's testimony conflicted with Steven's in another way. As she drove away from the farm to contact the sheriff, she testified her husband and Toby were walking away from the station wagon, in different directions. Steven's testimony was that the shooting began 15–20 seconds after he heard Susan Blythe's car leave the farm. In the time period after her departure and before the shooting, he said he heard no sounds that would explain why the victims suddenly, quickly and quietly returned to their car. The jury could reasonably have concluded that some confrontation or warning event happened during that time, causing the victims to run back to their car.

In *State v. Lloyd,* 345 N.W.2d 240, 245 (Minn.1984), this court held that resolving conflicting testimony is the exclusive function of the jury because it has had the opportunity to observe the demeanor of witnesses and to weigh their credibility. It is for the jury to determine the weight and credibility of the testimony of the individual witnesses. *State v. Engholm,* 290 N.W.2d 780, 784 (Minn.1980). On review, we will "assume that the jury believed the State's witnesses and disbelieved everything which contradicted their testimony." *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980). The jury verdict in this case indicates that the jury did not believe Steven's version of events.

Steven argues strongly that he had no motive to kill Blythe, whereas his father did. Proof of motive is not required to prove guilt of murder. However, motive helps form inferences from a pattern of circumstantial evidence. James Jenkins had the more apparent motive to harm Rudy Blythe. There was evidence that he lost his farm to Blythe in 1980, that he believed Blythe was a cause of his inability to get the credit necessary to begin farming again and that he expressed some sexual jealousy of the banker. Although there was no evidence that Steven and Rudy knew one another, the jury could have con-

cluded that any motive Steven might have had derived from his father's and grew out of their closeness and common purpose to begin a new life farming together.

■ We have reviewed the record in great detail, ascertaining, as did the jury, the pattern of circumstantial evidence. Under the *Threinen* standard of review, the reasonable inferences from this pattern of circumstantial evidence must be "inconsistent with any rational hypothesis except that of [defendant's] guilt." *Threinen*, 328 N.W.2d at 156. The evidence as a whole need not exclude all possibility that the father, not the son, was the killer. It must, however, make that theory seem unreasonable. We hold that the evidence, taken as a whole, meets this strict standard and identifies Steven, beyond a reasonable doubt, as the person who killed Rudy Blythe and Toby Thulin.

■ 2. Steven next argues that even if he is identified as the killer, there is not sufficient evidence to prove he killed Rudy Blythe with premeditation. Blythe's murderer clearly intended to kill him. Premeditation is more than intent to kill, however. *State v. Ulm*, 326 N.W.2d 159, 162 (Minn. 1982). Premeditation, according to Minn. Stat. section 609.18, means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Premeditation is inferred from words and actions in light of the totality of surrounding circumstances. *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn.1981). As a state of mind, premeditation can usually only be proved circumstantially, and the jury is considered best able to weigh the evidence. *State v. Linder*, 304 N.W.2d 902, 906 (Minn.1981).

Key evidence of premeditation in this case was that Blythe's killer shot repeatedly and chased his victim from the first shooting site to the second shooting site to fire the fatal shots. Also, Steven admitted he went to the farm with a violent plan to "rob and scare" Rudy Blythe. He and his father arrived at the farm with numerous weapons and Steven admitted he took 3 of those weapons out of the truck, indicating intent to use them.

■ These circumstances resemble those in *State v. Amos*, where a defendant who deliberately armed himself and ran across the street to shoot his victim was found to have acted with premeditation. 347 N.W.2d 498, 501 (Minn.1984). Premeditation may be formed almost instantaneously. *State v. Neumann*, 262 N.W.2d 426, 430 (Minn.1978). Though Steven was not charged with the premeditated killing of Thulin, it is consistent with this court's rulings to find he formed the requisite "plan" in the interim between the two murders as he chased Blythe. We hold the evidence sufficient to prove the element of premeditation in the death of Rudy Blythe.

3. Steven contends the trial court improperly excluded certain evidence offered at trial to prove a duress defense or to prove that his father, not he, killed Blythe and Thulin. The evidence he offered included: expert psychiatric testimony that his father was mentally unstable or insane; character evidence and evidence of specific incidents of bad conduct to show his father was angry, belligerent, cruel to animals, suicidal and had threatened to harm and kill others; and, a graphological assessment of his father's personality. Steven also offered his own polygraph test results. The trial court excluded certain portions of this evidence and ruled other portions could be offered at trial.

At the conclusion of the trial, defense counsel stated Steven was abandoning the duress defense. The trial court agreed insufficient evidence pertaining to duress had been offered to submit the issue to the jury. In his post-trial motion for new trial or to vacate judgment, Steven argued the trial court exclusion of certain evidence destroyed his duress defense and violated his constitutional rights under the sixth and fourteenth amendments. These motions were denied by the trial court judge.

The proffered expert psychiatric testimony consisted of an assessment of his father's personality and of Steven's relationship with his father. The assessment was

based on interviews with Steven and with his family, all conducted after the murders and his father's suicide. The trial court excluded this evidence on two grounds. First, that the psychiatric evaluation was entirely based on hearsay as regards its conclusions about James Jenkins and, therefore, was too speculative and unreliable an opinion to be competent. The trial court also ruled that the duress evidence offered related to the influence of the father over his son and this was a matter within the common experience of a jury so as to preclude the necessity for expert testimony. Expert testimony is admitted under Minn.R.Evid. 702 if it will assist the trier of fact to understand the evidence or to determine a fact in issue. Even if relevant, evidence may be excluded under Minn.R.Evid. 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. We hold the trial court properly excluded this evidence.

 Steven offered into evidence his own polygraph test results. He also offered a graphological personality assessment of his father, an analysis of handwriting, to show that his father was a violent, threatening man. The trial court excluded both as too unreliable to have probative value. The scientific technique on which expert testimony is based must be scientifically reliable and broadly accepted in its field. *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980). Polygraph test results are not admitted in Minnesota civil or criminal actions because there is insufficient evidence of their reliability. *State v. Michaeloff*, 324 N.W.2d 926, 927 (Minn.1982). We affirm that judgment of unreliability here. The polygraph test results were properly excluded.

 The admissability of a graphological personality assessment is a matter of first impression in this state. "Graphology" is defined in Webster's New Collegiate Dictionary (1977) as "the study of handwriting especially for the purpose of character analysis." Thus, graphological analysis is distinct from handwriting analysis, widely accepted by this court and others as a means to identify a signature as that of a particular signer. Most other jurisdictions that have considered the admissability of expert graphological personality assessment have excluded it as too scientifically unreliable. *See, People v. Hester*, 39 Ill.2d 489, 237 N.E.2d 466, 480 (1968) (handwriting analysis of note victim was writing at moment she was attacked to show her state of mind excluded) *cert. denied* 397 U.S. 660, 90 S.Ct. 1408, 25 L.Ed.2d 642 (1970); *Daniels v. Cummins*, 66 Misc.2d 575, 580–82, 321 N.Y.S.2d 1009, 1014–16 (N.Y.Sup.1971) (handwriting expert may give opinion of genuineness of signature, but may not testify as to signer's mental state or capacity). Our review of the scientific literature indicates that the technique of graphology is accorded a low measure of scientific reliability in predicting character or state of mind and is not generally accepted in the scientific fields of psychology and psychiatry. For these reasons, a graphological personality assessment does not meet the standard required for admission of expert testimony under *Frye* and its Minnesota progeny. We hold the exclusion of a graphological personality assessment of James Jenkins was proper.

Steven also offered evidence of his father's general reputation and specific acts of past bad conduct to prove his duress defense and that his father, acting in conformity with that reputation or behavioral history, was the killer of Blythe and Thulin. The trial court ruled such evidence admissible only to the extent it would be admitted against James Jenkins himself under Minn. R.Evid. 404(a) and (b) were he a defendant. All exceptions to the general bar on bad character evidence would apply, allowing in evidence showing "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R.Evid. 404(b). Thus, any evidence that James threatened or behaved threateningly towards the victims would be admitted. Further, the trial court ruled admissible any evidence of James' character or bad

conduct relevant to Steven's proposed duress defense. The court was willing to consider any evidence with "some bearing on the general issue of intent," including conduct or statements by the father that occurred in Steven's presence or within his awareness, or evidence demonstrating "the nature of the relationship" between father and son.

■ The trial court's general ruling on character evidence conforms to the guidelines we set out in *State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn.1977) which require a proper foundation of facts connecting a third person to the crime before otherwise-excluded character evidence of that person may be introduced to raise a reasonable doubt that the accused committed the crime. James Jenkins was connected to the crimes by his past dealings with Blythe, by his telephone call luring Blythe to the farm and by his presence at the scene. We hold the trial court properly determined the admissibility of evidence of James Jenkins' character offered either to prove Steven acted under duress or that his father was the killer.

■ 4. Following return of the jury verdict, defense counsel moved the trial court to conduct a *Schwartz* hearing to investigate alleged incidents of jury misconduct. *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960). A *Schwartz* hearing is not mandated until a defendant establishes a prima facie case of jury misconduct. *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979) *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). To establish a prima facie case, sufficient evidence "which, standing alone and unchallenged would warrant the conclusion of jury misconduct" must be submitted. *Id.* Generally, such hearings are to be liberally granted. *Olberg v. Minneapolis Gas Co.*, 291 Minn. 334, 343, 191 N.W.2d 418, 424–25 (1971). The trial court denied the motion because Steven presented no evidence which, to the court, reasonably suggested jury misconduct.

Steven's counsel submitted three affidavits to establish a prima facie case. One relayed the comments of a juror, reported through a chain of conversations, that she felt she was "exposed to tremendous pressure in the Jenkins trial." A second affidavit, from Steven's mother, stated she had seen female jurors using the courthouse public bathrooms during the trial and described "much commingling between Jury, Press and audience." She also stated she heard jurors say they were going to watch themselves on television. A final affidavit by defense counsel described a conversation during the trial between a newspaper reporter and the jury foreperson. This last incident was brought to the court's attention during the trial, whereupon the court held a hearing in chambers and found the subject of the conversation to be a prescription medicine for an ailing back. The court then delivered an additional admonition to the jury about their duty to avoid outside contacts.

■ A prima facie case for a *Schwartz* hearing may be based on hearsay, as was much of the evidence submitted in these affidavits, but the case alleged may not be "wholly speculative." *See also, State v. Mings*, 289 N.W.2d 497, 498 (Minn.1980); *Olberg*, 291 Minn. at 342, 191 N.W.2d at 424. In the affidavits before the trial court, the alleged jury behavior is only vaguely described and the credibility of the statements ascribed to certain jury members is doubtful because their alleged remarks are reported through multiple levels of hearsay. Such allegations are insufficient to establish a prima facie case. We hold the trial court did not err in denying the motion for a *Schwartz* hearing based on speculative and doubtful allegations of jury misconduct.

5. The final issue is whether the trial court's failure to sequester the jury during its deliberation denied Steven a fair trial by an impartial jury. The court recessed the jury overnight during its deliberations. Steven neither consented nor objected to

this separation, nor had he previously requested sequestration. The next morning when the jurors returned to complete their deliberations, Steven did not request that the trial court question them about any outside influences they may have encountered, nor did the trial court, on its own, conduct such an inquiry.

Steven correctly notes that Minn.R.Crim.P. 26.03, subd. 5(1) requires the jury to be sequestered if they recess overnight during deliberations unless the defendant consents to the separation. We have recently held, however, that mere separation of the jury in violation of Minn.R. Crim.P. 26.03, subd. 5, without more, does not raise a presumption of prejudice. *State v. Sanders,* 376 N.W.2d 196 (Minn. 1985). Prejudice in such a case will be presumed only upon a showing of any private communication or contact or any other circumstance suggestive of improper influence or jury tampering, direct or indirect. The State will then bear the burden of overcoming the presumption. *Id.* The record before us contains no showing of any such private communication or contact or any other circumstance such as pervasive, unfavorable publicity suggestive of improper influence or jury tampering, direct or indirect. Nor do the circumstances of the separation justify an inference of prejudice. We hold that lack of sequestration of the jury during its deliberation, on this record, did not deny Steven a fair trial by an impartial jury.

Because we find no error in the trial court's rulings or actions, and because the evidence is sufficient to prove beyond a reasonable doubt that Steven, not his father, killed Rudolph Blythe and Deems Thulin and that the killing of Rudolph Blythe was premeditated, we affirm the convictions and sentences in this case.

Affirmed.

KELLEY J., took no part in the decision or consideration of this case.