## STATE v. RAYMOND W. KOTKA.

152 N. W. (2d) 445.

August 4, 1967—No. 38,969.

332

*James C. Noonan,* for appellant.

*Douglas M. Head,* Attorney General, *John C. Arko,* County Attorney, and *David A. Petersen,* Assistant County Attorney, for respondent.

PETERSON, JUSTICE.

Defendant, Raymond W. Kotka, was charged and convicted of murder in the second degree for the unpremeditated shooting to death of Nestor Marttinen in St. Louis County on October 3, 1961.[1]

---

[1] Minn. St. 609.19 provides: "Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years."

The primary issue on this appeal from the conviction is whether the alleged murder weapon, a .32-caliber pistol owned by defendant, was properly admitted into evidence over the present objection that it was the inadmissible fruit of an unlawful search and seizure. Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, 84 A. L. R. (2d) 933. The argument, in greater detail, is that the weapon was removed from Kotka's person at a time when there was neither an arrest nor probable cause for his arrest and at a time when his residence was being searched by sheriff's deputies without a search warrant.

A secondary issue, argued but not briefed, is whether, notwithstanding the decision upon the primary issue, there was sufficient identification of defendant's pistol as the murder weapon either to permit its introduction into evidence or to constitute proof beyond a reasonable doubt of his guilt.

■ A preliminary issue is raised by the state's claim that the primary issue—unlawful search and seizure—is not properly here for review because defendant at trial only objected that the pistol was "immaterial and irrelevant," without referring to any constitutional basis for suppressing such evidence. The issue admittedly was raised for the first time on defendant's post-trial motions for acquittal notwithstanding the verdict or for a new trial. The Mapp doctrine had been announced a few months before this trial, but defense counsel states that he is not a regular practitioner of criminal law and was unaware of the decision during trial. Defendant urges that as a matter of fundamental due process he should not under these circumstances be penalized for the inadvertence of counsel in not moving to suppress the pistol as evidence.[2] It is not a denial of due process to require that such issues be timely raised in the trial court

Section 609.18 provides: "For the purposes of sections 609.185 and 609.19, 'premeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission."

[2] Defendant cites Brown v. Mississippi, 297 U. S. 278, 56 S. Ct. 461, 80 L. ed. 682, as authority against foreclosing the issue now. Brown, being a case of coerced confession rather than unlawful search and seizure, is not directly in point, however, for search and seizure issues present quite different questions of evidentiary reliability. Linkletter v. Walker, 381 U. S. 618, 85 S. Ct. 1731, 14 L. ed. (2d) 601.

itself as a condition of consideration on appeal. See, One 1961 Lincoln Continental Sedan v. United States (8 Cir.) 360 F. (2d) 467; Robinson v. United States (8 Cir.) 327 F. (2d) 618; State v. Taylor, 270 Minn. 333, 133 N. W. (2d) 828; State v. Richter, 270 Minn. 307, 133 N. W. (2d) 537, certiorari denied, 382 U. S. 860, 86 S. Ct. 119, 15 L. ed. (2d) 98. Nevertheless, because so grave a criminal conviction is at stake; because a substantial effort was timely made to prevent the reception of this most crucial piece of evidence in the case; and because the record before us fully reflects the facts and circumstances of the alleged unlawful acts of search and seizure, we will consider the issue on its merits in the interest of substantial justice. State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. (2d) 3; State ex rel. Beltowski v. Tahash, 266 Minn. 182, 123 N. W. (2d) 207, certiorari denied, 375 U. S. 947, 84 S. Ct. 358, 11 L. ed. (2d) 278. By so doing, however, we do not intend to undermine the force of our prior decisions governing issues which may be raised on appeal.

We have searched the long record in this case with great care and concern, prompted particularly by the circumstantial nature of the evidence upon which defendant was convicted. We have been mindful that a conviction upon circumstantial evidence cannot be sustained, against the presumption of innocence, unless the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt. State v. Kaster, 211 Minn. 119, 300 N. W. 897. The standard of appellate review in any such case, however, is that stated in State v. Kline, 266 Minn. 372, 374, 124 N. W. (2d) 416, 418, certiorari denied, 376 U. S. 962, 84 S. Ct. 1124, 11 L. ed. (2d) 980:

"* * * [W]e do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the jury to reach that conclusion."

We are convinced that by any reasonable standard, the evidence supports the verdict.

Marttinen, a retired lumberjack, was on the day of his death living as a tenant in defendant's roominghouse in Solway Township, in the Cloquet-Duluth area. They had been friends for 30 years and admittedly shared an addiction to alcohol. They apparently got along well together, except that Marttinen was said to get "mad" if anyone took his whisky. They had been together all day on October 3, driving in defendant's car to various places. Marttinen was a large man and had difficulty walking, particularly when drinking. Defendant was a considerably smaller man who apparently, at least according to his own testimony, could drive quite well even after substantial drinking. At about 9:30 a. m. that day Marttinen, with defendant present, cashed at a local store a pension check and a social security check totaling about $156. At Marttinen's request, the storekeeper gave defendant $57 of this amount in payment of room and board. Marttinen requested the storekeeper to be a witness to the payment. Marttinen put the balance in his pants pocket. Marttinen later spent an additional amount for two pints of whisky, and defendant purchased one-half pint for himself. They were seen together at various times during the morning and later into the afternoon, including stops for drinks, food, and a free haircut for Marttinen at the home of a friend, who had to assist Marttinen into the house. Marttinen was never seen alive again.

Later that same day, at about 5 p. m., defendant appeared alone at the home of his niece. He was quite drunk and shot "a little gun" once in the air outside her home. He gave his niece $100 for the payment of various bills he owed on properties that he owned, it being her practice to perform that service for her uncle.

Marttinen was found 3 days later by partridge hunters, face down under branches and brush, a few feet from an overgrown "tote" road leading toward a 40-acre tract of unimproved land owned by defendant about 2 miles from his residence. Marttinen had been shot twice in the face and a third time in the back of the head. The first two shots were apparently at close range, evidenced by powder burns on his face. A gunshot wound through the fingers of his left hand indicated that one shot penetrated Marttinen's hand while upraised in front of his face. The condition of the grass on and adjacent to the tote road indicated that a car had been there and that the body had been dragged about 10 feet from the tote

road to the underbrush. Marttinen's shoes were later found several feet farther beyond where his body lay, apparently having been thrown there by his assailant. There was no identification on his person. His pants pocket had been recently ripped and there was no money there except one silver quarter.

On October 4, at about 5:45 a. m., prior to the discovery of Marttinen's body, defendant telephoned the sheriff of St. Louis County and reported that Marttinen was missing "since last night." Two deputies stopped at defendant's house the afternoon of the next day, but he was not there. They stopped again on October 6, still prior to the discovery of Marttinen's body, at which time defendant told them that Marttinen was still missing. Defendant at that time told the deputies that Marttinen had $150 in his pocket and had left with a stranger in a station wagon on October 3, owing defendant $57.[3]

Upon discovering Marttinen's body, later in the day of October 6, the hunters had reported it to the St. Louis County sheriff. After investigating the scene of the crime at about 7:30 p. m., four sheriff's deputies and the coroner went to defendant's house, thinking that the unidentified body might be that of Marttinen, the subject of defendant's earlier missing-person report, and hoping to find a photograph of Marttinen for identification purposes. Upon their arrival at about 9:30 p. m., there were no lights on in the house and they received no response after knocking on the front door for about 5 minutes. A deputy then opened the unlocked door and "hollered, 'Is anybody home?' " Defendant appeared from one of the rooms, obviously intoxicated and "befuddled" but able to walk without staggering. The deputies identified themselves and asked whether

[3] Defendant did not claim that he had himself seen Marttinen leave but that Christ Kinden, the only other tenant in the house, had reported it to him. This was never confirmed by Kinden. The vehicle of such general description, if Kinden had in fact said such a thing to defendant, appears to have been that of a friend who had come to borrow defendant's battery charger by pre-arrangement earlier that day. Kinden was apparently a somewhat senile person who could not even identify Marttinen's body when he viewed it later that day; his testimony as a witness at trial was confusing and, in the words of the trial court, it went "in many directions." No effort was made to in any way implicate Kinden in the crime.

Marttinen had returned. Defendant said that he had not and, upon request, escorted them to Marttinen's room.

There is no evidence whatever that defendant voiced any objection to their entering his house or searching Marttinen's room. No search was made in the house other than in Marttinen's room. The sheriff's deputies found no picture of Marttinen there. But two other important items were in plain sight. First, they saw a small metal box under Marttinen's bed. The lock and hasp of the box had been broken off. Defendant stated to the coroner that he had broken into the box to look for Marttinen's papers, but he admitted that it was the place in which Marttinen usually kept a pint of whisky. The keys to the box, which Marttinen usually kept on his person, were lying near the box at that moment. The most vital aspect of this discovery relates to the claim of unconsented search in terms of what defendant said concerning it at trial:

"Q When you were cleaning there, why didn't you pick the pieces up.

"A I just left them the way they are.

"Q Why?

"A Because whoever broke it, *I thought they wanted to see it, you know. The investigator who comes, they can see that it's broken.*

"Q Investigator come?

"A Yes.

"Q *Why would the investigator come to your house?*

"A *I called the Sheriff's Department to have them come; I can show it to them.*

"Q Did you consider this important?

"A Well, I think so." (Italics supplied.)

The second discovery in the room, and in plain sight, was the .32-caliber pistol now in issue. One of the deputies noticed the gun sticking out of defendant's pocket and asked, "What have you got there?" Defendant, without speaking, handed the gun to the deputy. In response to a question as to whether he had any ammunition for it, defendant emptied his pockets and produced one bullet. Defendant was not at this time under arrest.[4]

---

[4] At about 10:30 p. m. defendant and Kinden were taken to the morgue

An FBI firearms expert gave ballistics testimony at trial, based on examination of the three lead bullets removed from the deceased and test firings of defendant's pistol. He testified that two of the bullets were too mutilated to permit any determination of rifling characteristics (due to impact, as the pathologist testified, with the skull bones of the deceased). Although the third bullet was less mutilated and exhibited lands and grooves of similar number, dimension, and direction of twist as defendant's gun, it was still too mutilated on the surface to permit microscopic determination of crucial individual characteristics. The expert could not, therefore, positively identify that it was fired from defendant's (and only defendant's) pistol. He did testify that it *could* have been fired from defendant's pistol, in the sense that it narrowed the identification to the make of defendant's pistol and to the exclusion of many other .32-caliber pistols of different manufacture. Despite his earlier statement to the sheriff's deputies that he had not fired the weapon for several weeks, it is clear that defendant had indeed fired the pistol at least once the day of October 3 and that on the following day he had attempted to purchase a box of bullets in Cloquet.[5]

in Duluth where defendant identified Marttinen's body. Defendant was then taken to the St. Louis County jail and placed under arrest.

[5] The Cloquet supplier had no box of bullets in stock, but defendant purchased the *one bullet* the supplier had, presumably the bullet he gave to the deputies on October 6. This is not a complete catalog of all the evidence implicating defendant, but only so much as is most relevant to the two issues presented. Defendant was apparently not a credible witness in his own behalf. A late-in-the-day alibi, once the pathological evidence appeared to establish the time of Marttinen's death, was obviously not believed. The state produced witnesses who knew defendant and who were present at the time and place where he claimed to have been on October 3; they testified that they did not recall seeing him at that time and place. Despite the missing-person report, there was some evidence that defendant stated to others as late as October 6 that Marttinen had gone to Floodwood or Prairie Lake, and yet other evidence that he did not even mention Marttinen's absence to persons whom he would expect might be interested or concerned about him. The spot where Marttinen's body was found was the only point for some distance on the "tote" road where a car could turn around, a fact seemingly known to defendant among few others.

■ The most crucial issue is whether defendant's pistol was inadmissible in evidence as being the product of an unlawful search of defendant's residence. Decision upon that issue narrows to consideration of the precise point in time when the sheriff's deputies and coroner, having opened the outer door of defendant's residence, crossed the threshold and defendant then and there appeared. If they crossed that threshold [6] without defendant's consent, the subsequent search of his premises was, under the facts of this case, unlawful; and with the pistol then excludable from evidence, the state concedes the conviction could not stand.[7] If, however, their entry across his threshold was with his consent, that consent embraced all the search activities that in fact occurred that night, making the pistol admissible, at least against the objection of an unlawful search.

We are convinced that the search of defendant's residence was, from the outset, with his actual and competent consent. We held in State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94, that the question of consent is a

---

[6] This is so because whatever right existed to be in decedent's room, as far as decedent was concerned, they could not get there without crossing the threshold of the home itself, owned by defendant. This is not to say, however, that defendant would otherwise be without right to object to a search of Marttinen's room, based on his interest as the lessor of such premises with his own right legitimately to be on that particular portion of the premises. See, Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. ed. (2d) 697, 78 A. L. R. (2d) 233.

[7] Because it is clear from the testimony of the deputies that they had not come to arrest defendant and did not then arrest him, the search could not otherwise be defended as a search incident to a lawful arrest. Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. ed. 145. There was, indeed, no probable cause for the arrest of defendant at the time of the search, with or without a warrant. Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. ed. (2d) 697, 78 A. L. R. (2d) 233. Probable cause undoubtedly arose subsequently with identification of the dead man as Marttinen and the uncovering of evidence in the search itself which tended to implicate defendant in the crime. The product of an unlawful search, of course, cannot relate back to validate an unlawful search or arrest. Henry v. United States, 361 U. S. 98, 80 S. Ct. 168, 4 L. ed. (2d) 134; Johnson v. United States, 333 U. S. 10, 68 S. Ct. 367, 92 L. ed. 436.

question of fact, that the failure to object is evidence of consent, and that the burden of proving absence of consent rests upon the defendant. We do not in this case have to determine the question of whether an intoxicated person may be presumed to grant consent by failure to articulate objection,[8] for we hold that in the unique circumstances of this case defendant gave consent even before the time of his intoxication. He not only consented at a time when no question of intoxication existed but actually and affirmatively *invited* the search. His act of making a missing-person report to the St. Louis County sheriff on October 4 was itself the grant of consent or invitation to come to his home and to do anything reasonably necessary to clear up the missing status of Marttinen. This concession is reinforced by other circumstances. Defendant's reaction to the visit of the sheriff's deputies to his home earlier in the day on October 6 additionally established his understanding that personal contact with him at his home was a normal incident to the investigation process and that he might expect other visits from them. The return of the deputies to his home upon discovery of the then-unidentified body of Marttinen later that day was both reasonable and responsive to defendant's voluntary request for their assistance. Defendant's sober testimony at trial again confirmed what he was rational enough to understand at the previous times regardless of his insobriety. He had, he testified, called the sheriff "to have them come" and had something to show "the investigator who comes." [9]

---

[8] The United States Supreme Court has not clearly defined what constitutes consent. One Federal court, without elaboration, has held that an intoxicated person can give consent to a search. United States v. Hickey (E. D. Pa.) 247 F. Supp. 621.

[9] State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. (2d) 56, although factually different, is rationally in point for the facts of this case. The ultimate test of a search and seizure, moreover, is whether it is reasonable under the facts of each case. United States v. Rabinowitz, 339 U. S. 56, 66, 70 S. Ct. 430, 435, 94 L. ed. 653, 660; Cooper v. California, 386 U. S. 58, 87 S. Ct. 788, 17 L. ed. (2d) 730; Warden, Maryland Penitentiary v. Hayden, 387 U. S. 294, 87 S. Ct. 1642, 18 L. ed. (2d) 782. We are reminded again that the requirements of the Fourth Amendment are practical and not abstract. United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. ed. (2d) 684.

Defendant does not otherwise challenge the manner in which the deputies took possession of his pistol. It was Marttinen's metal box which defendant intended to show them, but they did not take possession of the box until after he was later placed under arrest. They did not "seize" the gun for it was in plain sight on his person [10] and taken from him with his consent and without force. When one of the deputies asked what it was, defendant, in his own words, "gave" it to them.[11]

■ The pistol, realistically and contrary to defendant's actual objection at trial, was relevant and material and, being relevant, had probative value. State v. Crosby, 277 Minn. 22, 151 N. W. (2d) 297. Although the testimony of the ballistics expert was not conclusive in showing that the bullets which killed Marttinen were fired from defendant's gun, the limitation of such testimony affected only the weight and not the admissibility of the gun as evidence. There is no question that Marttinen died from .32-caliber bullet wounds and that defendant possessed a gun specifically capable of firing bullets of that caliber.

This court has many times held that proof that defendant possessed the type of weapon or instrumentality with which the crime was committed is sufficient to make the weapon admissible. State v. Minot, 79 Minn. 118, 81 N. W. 753; State v. McClendon, 172 Minn. 106, 214 N. W. 782; State v. Barone, 173 Minn. 232, 217 N. W. 104; State v. Nichols, 179 Minn. 301, 229 N. W. 99; State v. Wofford, 262 Minn. 112, 114 N. W. (2d) 267. See, also, State v. Danielsen, 276 Minn. 428, 150 N. W. (2d) 567.

The similar rule in other jurisdictions is exemplified by Commonwealth v. O'Toole, 326 Mass. 35, 92 N. E. (2d) 618. The murder victim in that

---

[10] See, State v. Huffstutler, 269 Minn. 153, 130 N. W. (2d) 347; State v. Clifford, 273 Minn. 249, 141 N. W. (2d) 124.

[11] One of the deputies testified that they "took" the gun from defendant, but this does not necessarily connote that the taking was an involuntary act. The important fact, as a practical matter, is that the deputies during the lawful search learned from their own senses and from defendant himself that defendant *possessed a gun.* Had defendant retained the gun during the trip immediately thereafter to the morgue, the deputies unquestionably could have removed it from him as a search lawfully incident to the arrest following identification of the deceased. See footnote 7, *supra.*

case had his skull fractured by blows from some blunt instrument. The defendant objected to the admission into evidence of a pistol of foreign make found behind a radio in his room, the butt of which was capable of being the blunt instrument with which the decedent's skull was fractured. The court sustained the reception of the pistol into evidence and, with citation of decisions from several other state jurisdictions, said (326 Mass. 39, 92 N. E. [2d] 620):

"* * * There was no direct evidence that the pistol was in fact the instrument used. But it is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used."

■ The jury under all the evidence in this case could find beyond a reasonable doubt that defendant murdered Marttinen. The victim died of .32-caliber bullet wounds, which defendant had the capability of inflicting. Marttinen and defendant had been together all day, and Marttinen died at a time when, as the jury could find, defendant and Marttinen were still together. The evidence wholly excludes any claim that the wounds were self-inflicted, and no evidence of record supports any hypothesis that those wounds were suffered at the hands of any other person. There was no evidence which the jury was bound to accept which was consistent with any reasonable hypothesis of defendant's innocence or inconsistent with his guilt.

Affirmed.