STATE of Minnesota, Respondent,

v.

Teresa NORDSTRUM, Appellant.

No. C6–85–1673.

Court of Appeals of Minnesota.

April 15, 1986.

Hubert H. Humphrey, III, Atty. Gen., Alfred P. Zdrazil, City Atty., Bemidji, for respondent.

Thomas L. D'Albani, Bemidji, for appellant.

Heard, considered and decided by WOZNIAK, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

HUSPENI, Judge.

Appellant Teresa Nordstrum was convicted of fifth degree assault in violation of Minn.Stat. § 609.224 (1984) and of contributing to the neglect of a child in violation of Minn.Stat. § 260.315 (1984). The trial court sentenced Nordstrum, only on the latter offense, to sixty days in jail and a fine of $300.00 (plus $30.00 in a surcharge and $4.00 in costs). On appeal, Nordstrum challenges the sufficiency of the evidence. We affirm.

## FACTS

Nordstrum's convictions arise out her of alleged physical abuse of H.D. between January 14, 1985, and January 18, 1985.

On or around January 3, 1985, Nordstrum moved into the home of K.D. and began working as a live-in babysitter of K.D.'s three children, S.D., J.D., and H.D., ages five, three, and twenty months, respectively.

K.D. worked the 3–11 shift as a geriatric nursing assistant at a local nursing home. She worked four days during the normal work week and every other weekend. K.D. testified that she hired Nordstrum to take care of her children and do general housework.

K.D. went out of town on the weekend of January 12–13 and left Nordstrum to care for the children. K.D. testified that when she returned she felt that the children were getting on Nordstrum's nerves. Sometime

early in the following week, K.D. told Nordstrum that her employment would be terminated as of Friday, because K.D.'s sister was going to move in and help her with the children. K.D. testified that other unspoken reasons for the termination were that she was not satisfied with the way Nordstrum kept the house, that she did not think Nordstrum was capable of caring for the children and that Nordstrum failed to dress, bathe and take care of the children as she was supposed to in the morning before K.D. woke up.

K.D. testified that when she changed H.D.'s diaper on Sunday, Monday and Tuesday she did not notice anything unusual. She also testified that she would have seen any bruises on his buttocks if they had been there. K.D. testified that she did not change H.D.'s diaper between Tuesday evening and Friday. She also testified that the bruises on H.D.'s buttocks were not visible when he was wearing a diaper. She further testified that between Tuesday evening and Friday no one other than herself and Nordstrum took care of the children.

Nordstrum had part of Monday off. K.D. testified that Nordstrum had Tuesday off and K.D. cared for the children until she went to work and then DeAnn Himmelright took care of them. Himmelright is a licensed day care operator who had taken care of K.D.'s children occasionally since July 1984. Nordstrum testified that even though she had Tuesday off she still took care of the children until about noon.

On the mornings of Wednesday, Thursday and Friday, Nordstrum did take care of the children.

On Wednesday, the children were in Nordstrum's care most of the day. K.D. was gone most of the morning. When K.D. arrived home in the early afternoon before going to work, she noticed a bruise on H.D.'s face that was not there earlier in the day. K.D. testified that Nordstrum told her that H.D. had fallen and hit his face on a coffee table. Nordstrum testified that she told K.D. that H.D. fell on the arm of a wooden chair.

K.D. testified that on Thursday both she and Nordstrum were at home in the morning. The children were left in Nordstrum's care when K.D. went to work. Nordstrum testified that, after K.D. got up on Thursday, K.D. took care of the children and Nordstrum went to visit a friend until it was time for her to take care of the children in the afternoon.

On Friday Nordstrum had the day off and K.D. took the children to Himmelright's day care center for the morning. When K.D. picked the children up at about noon, Himmelright asked her about the bruises on H.D.'s buttocks. K.D. testified that this is the first time she saw the bruises. She went home and called the police. That afternoon, pursuant to police instructions, K.D. took H.D. to Dr. John Parkin, a pediatrician, who photographed the bruises on H.D.'s face and buttocks. The photographs reproduced as slides were admitted into evidence at trial.

That weekend K.D. left the children with her parents. She testified that on Monday she confronted Nordstrum about the bruises and Nordstrum admitted spanking H.D. but denied hurting him.

At the time of H.D.'s injuries, K.D. had been separated from her husband for a few months and there was an outstanding court order prohibiting him from visiting the children. She is now divorced. K.D. testified on cross-examination that a few years ago her ex-husband had spanked S.D. on the buttocks and caused bruising, but he never caused similar bruising on the other two children. She also testified that her ex-husband physically abused her and he was subject to criminal charges as a result. There is no evidence that her ex-husband had contact with H.D. during the week in issue.

There is evidence that during this time K.D. was taking anti-depressants and diet pills, and that combining the drugs was not a recommended practice. K.D. testified that she did not notice any side effects resulting from the combination of the drugs.

At trial, Dr. Parkin testified about his January 18, 1985 examination of H.D. He opined that the bruise on H.D.'s face resulted from a hard hand slap. He based this opinion on the fact that the bruise had an impression of three lines which reflected the impact of fingers. He testified that the bruising probably occurred on Tuesday or Wednesday of the week in issue.

Dr. Parkin also testified about the multiple bruises around and on H.D.'s buttocks and anus. Based on the coloring of the bruises, he testified that these bruises were more recent than the facial bruise and that the bruises probably occurred over a three-day period, mainly on Wednesday and Thursday. By referring to the slides, Dr. Parkin estimated the age of the different bruises. He opined that H.D. had been struck on multiple occasions. He believed that an object caused the bruising around H.D.'s anus, but he was unable to determine exactly what kind of object. He ruled out the possibility that H.D. was sexually abused because there was no sign of penetration of the anus. He further testified that K.D. told him that she had not changed H.D.'s diaper for two days.

At the time that Nordstrum was living at K.D.'s home, she was nineteen years old, had graduated from high school in 1983, and moved to Bemidji in order to attend Bemidji State University. Previously she had lived in Indus, Minnesota with her grandparents and was active there in high school activities. She attended Bemidji State until the fall of 1984 when she dropped out. She testified that before her job with K.D.'s children, she had been a babysitter for several different families and had never received any complaints from them. None of these jobs were full-time live-in jobs. Two of the persons for whom Nordstrum babysat testified that they trust Nordstrum with their children.

Nordstrum also testified that in caring for K.D.'s children her duties and salary were not clearly defined, and that she was responsible for the children even when K.D. was at home. She admitted spanking the children, but denied that she inflicted the bruises on H.D. In contradiction of K.D.'s testimony, Nordstrum also testified that she took care of the children in the mornings when she got up.

She also testified that she did not see the bruises on H.D.'s buttocks while he was in her care. She speculated that it was possible that she could have changed H.D.'s diaper without seeing the parts of his buttocks that were bruised. She admitted it was unusual that she did not see the bruises and she said she could not explain why she did not see them.

On rebuttal, Himmelright testified that she could not have changed H.D.'s diaper without noticing the bruises.

### ISSUE

Is the evidence sufficient to sustain Nordstrum's convictions?

### ANALYSIS

Nordstrum argues that the evidence is insufficient to sustain the jury's verdict.

It is undisputed that Nordstrum's convictions are based solely upon circumstantial evidence. A conviction based upon circumstantial evidence will be upheld if the "reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *State v. Threinen*, 328 N.W.2d 154, 156 (Minn.1983) (quoting *State v. Kotka*, 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied*, 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968)). A conviction based upon circumstantial evidence may stand "only where the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). The evidence as a whole need not exclude all possibility of the defendant's innocence; it must, however, make that theory seem

unreasonable. *See State v. Anderson*, 379 N.W.2d 70, 78 (Minn.1985).

Despite the stricter standard of review applicable to a conviction based upon circumstantial evidence, a jury is in the best position to evaluate the evidence in the record and its verdict must be given due deference. *Id.* at 75 (citing *State v. Linder*, 304 N.W.2d 902, 906 (Minn.1981)). In addition, resolving conflicting testimony is the exclusive function of the jury, because it has the opportunity to observe the demeanor of witnesses and to weigh their credibility. *State v. Lloyd*, 345 N.W.2d 240, 245 (Minn.1984). On review, we assume that the jury believed the State's witnesses and disbelieved any contradictory evidence. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978).

■ Nordstrum was convicted of violating Minn.Stat. § 260.315 and Minn.Stat. § 609.224. Section 260.315 provides that:

Any person who by act, word or omission encourages, causes or contributes to the neglect * * * of a child * * * is guilty of a misdemeanor.

Minn.Stat. § 260.315 (1984). Section 609.-224 provides that:

Whoever does any of the following commits an assault and is guilty of a misdemeanor:

\* \* \* \* \* \*

(2) Intentionally inflicts or attempts to inflict bodily harm upon another.

Minn.Stat. § 609.224 (1984).

The evidence in the record indicates that the bruise on H.D.'s face was intentionally inflicted and that whoever inflicted this injury caused or contributed to his neglect. There is also evidence that Nordstrum inflicted the injury. Nordstrum does not dispute that the bruise occurred while H.D. was in her care on Wednesday of the week in issue. Dr. Parkin testified that the bruise had an imprint of fingers and he opined that the bruise resulted from a hard hand slap. Slides of the facial bruise were in evidence for the jury to review. Nordstrum testified that when H.D. fell his cheek hit the arm of a wooden chair at least twice and, as a result, the bruise on H.D.'s face had a linear impression. Assuming that the jury disbelieved Nordstrum's explanation of the fall, which contradicted the doctor's opinion, the reasonable inferences arising from the evidence are consistent only with Nordstrum's guilt. *See Threinen*, 328 N.W.2d at 156.

■ There is no dispute that the bruises on H.D.'s buttocks and anus were intentionally inflicted. Nor is there any dispute that whoever inflicted the bruises caused or contributed to the neglect of H.D. The only issue before the jury was whether Nordstrum inflicted the bruises.

In support of her appeal, Nordstrum cites to the evidence of her unblemished record of babysitting. We recognize that Nordstrum did have experience babysitting before she undertook the care of K.D.'s children, but she did not have any experience as a full-time live-in babysitter. There is a great difference between being responsible for three young children on a full-time basis and babysitting on a short-term basis. Thus, we cannot conclude that the evidence of Nordstrum's experience as a babysitter is inconsistent with her guilt.

Nordstrum argues that the evidence is consistent with the rational hypothesis that K.D. inflicted H.D.'s injuries. We cannot agree. Nordstrum particularly relies upon K.D.'s testimony that she did not change H.D.'s diaper between Tuesday evening and Friday. Given the child care arrangements that K.D. had made, however, it is possible that K.D. did not change H.D.'s diaper during this time period. Although the evidence does not present a complimentary view of K.D. as a parent and K.D. did have exclusive control over H.D. at times during the week in issue, there is very little evidence to support the theory that K.D. caused H.D.'s injuries. The evidence does indicate that there was physical abuse in the family before Nordstrum was hired, but there is no indication that K.D. herself physically abused her children. Himmelright testified that she began taking care of K.D.'s children in July 1984 and that she

had never observed any signs of abuse. Likewise, Dr. Kenneth Olson testified that he had examined H.D. eight times since October 1983 and he had never observed any signs of abuse.

Finally, the slides in evidence show bruising over H.D.'s entire buttocks area. We believe it is highly unlikely that anyone could have changed H.D.'s diaper without seeing the bruises. After viewing the slides, the jury could reasonably disbelieve Nordstrum's testimony that she changed H.D.'s diaper and did not see the bruises.

Although there is no direct evidence that Nordstrum inflicted H.D.'s injuries, the reasonable inferences from the circumstantial evidence in this case are consistent only with a rational hypothesis of Nordstrum's guilt. *See Threinen*, 328 N.W.2d at 156. The jury's verdict indicates that it did not believe that part of Nordstrum's testimony that conflicted with other evidence in the record. Assuming the jury resolved the conflicts in the evidence against Nordstrum, the facts form "a complete chain" that leads directly to her guilt so as to exclude, beyond a reasonable doubt, any other reasonable inference. *See Wahlberg*, 296 N.W.2d at 411.

### DECISION

The evidence sustains Nordstrum's convictions.

Affirmed.