**STATE of Minnesota, Respondent,**

v.

**Robert L. EDGE, Jr., Appellant.**

**No. C6–87–1371.**

Court of Appeals of Minnesota.

April 26, 1988.

Review Denied June 21, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael Richardson, Asst. Co. Atty., David C. Brown, Clifford B. Wardlaw, Minneapolis, for respondent.

C. Paul Jones, Minnesota State Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by WOZNIAK, C.J., and SCHUMACHER and FLEMING *, JJ., without oral argument.

## OPINION

SCHUMACHER, Judge.

Appellant seeks reversal of his conviction for second degree murder or, in the alternative, a new trial. He contends the evidence of his intent to assault the victim was insufficient as a matter of law to sustain a conviction for second degree murder and that the court committed reversible error by refusing to instruct the jury on the lesser included offense of first-degree manslaughter. We affirm.

### FACTS

Appellant Robert Larry Edge, Jr., caused the strangulation death of his girlfriend Julie Guimont on March 3, 1986. A jury found him guilty of second-degree murder, the underlying felony being assault, and he was sentenced to 108 months in prison. Appellant admitted to causing the death of the victim, but denied that he intended to assault her. The victim's six-year-old son heard the sounds of a fight between appellant and the victim from his bedroom. There were no other witnesses.

Edge testified regarding the events surrounding the death of Julie Guimont as follows:

Edge and Guimont had lived together since the night they first met about six weeks before the murder. Edge had a wife and children in another state but Guimont wanted a permanent family relationship with appellant and her son. They argued repeatedly over their relationship and the amount of time Edge spent out with friends, but that those arguments never involved any physical violence. On the

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

night of Guimont's death, Edge ate supper with his friends, missing the meal Guimont had prepared for him. They quarreled when he returned home. Appellant subsequently fell asleep on the couch until Guimont woke him so they could go to bed. He was angry that she had failed to wake him earlier as he had made plans with his friends. Guimont subsequently overheard a telephone conversation between Edge and another woman. She also learned he was planning on leaving for a trip to Indiana the following morning. She asked to accompany him and he refused. As the argument escalated she threatened to throw him and his possessions out of her apartment. Appellant further testified that as he tried to leave, Guimont struck him in the back of the head with an iron. He turned as she drew back the iron to strike him again. Edge grabbed Guimont by the neck and began shaking her, telling her to drop the iron, and asking her if she'd gone crazy. When he heard her make a gurgling noise, he thought she was going to vomit and realized he was choking her. He shoved her toward the couch, yanked the telephone from the wall and left the apartment. Edge spent time driving around to "cool off," then returned to see if Guimont was all right. He realized she was dead when he entered the apartment and saw that she was in the same position as she had been when he left: face down with her head and upper torso on the couch, her lower body on the floor leaning slightly to the side. Edge panicked. As he packed his clothes, he heard the child coughing and vomiting. Appellant helped him to the bathroom, cleaned him up and put him back to bed, then returned to gather his things. When the child woke again, Edge helped him to the bathroom, and then put him back to bed, waiting until he appeared to be asleep and then bound his hands and feet together to prevent him from seeing his mother's body. Appellant then left the apartment, taking the victim's watch and leaving the front door unlocked. At 6:00 or 7:00 a.m., Edge telephoned his former roommate, asking to be let in. Later that morning, appellant picked up his welfare check and cashed it. He also sold Guimont's watch and a leather jacket she had left in his car for money to leave town. When Edge learned that Guimont's death had been discovered, he completed preparations for the trip to Indiana. Once in Indiana, Edge parked his car in his mother's garage and used her car for transportation. Four months later, appellant learned that the F.B.I. had been looking for him at his parent's home. He subsequently turned himself in to agents in Indiana.

Appellant was convicted by a jury and sentenced to the upper range of the sentencing guidelines for second degree murder. From that conviction and the denial of his motion for a new trial, Robert Larry Edge, Jr. now appeals.

## ISSUES

1. Was the evidence adduced at trial sufficient to support a finding that appellant intended to assault his victim?

2. Did the trial court err in failing to instruct the jury on first degree manslaughter?

## ANALYSIS

### I.

█ As Edge admits that he caused the death of Julie Guimont, the sole question on appeal is whether the evidence was sufficient to support a determination that he intended to assault her. The standard of review on appeal from a jury verdict in a criminal case was articulated by the Minnesota Supreme Court in *State v. Merrill:*

If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

274 N.W.2d 99, 111 (Minn.1978). Where the evidence is circumstantial, the verdict will be sustained where the reasonable inferences from the evidence are inconsistent with any rational hypothesis except the guilt of the accused. *State v. Roberts,* 350 N.W.2d 448, 451 (Minn.Ct.App.1984), *citing State v. Kotka,* 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied* 389

U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968).

Appellant contends there was insufficient evidence to establish his intent to assault the victim. Determination of intent is a question for the jury to decide. *State v. Alladin*, 408 N.W.2d 642, 648 (Minn.Ct. App.1987) *pet. for rev. denied* (Minn. Aug. 12, 1987). The evidence considered by the jury in this case came primarily from the appellant. He testified that he was angry and frustrated when Guimont struck him with the iron. Unable to grab her arm as she prepared to strike him again, he grabbed her by the neck telling her over and over again to drop the iron. He further testified that he didn't realize he was hurting her until he heard a gurgling sound whereupon he immediately released her. Edge then left the apartment without realizing Guimont was dead. The jury was not compelled to accept appellant's testimony as truth. The jury was able to listen to the testimony and observe his demeanor. They were also able to consider the testimony of others and to measure appellant's story against his behavior after the murder.

Experts testified that Guimont would have lost consciousness in as little as 10–20 seconds, but death would result only after 3–6 minutes of continuous strangulation, inconsistent with appellant's claim that he was only trying to get her to drop the iron and that he didn't realize he was hurting her.

Much of appellant's subsequent behavior is inconsistent with the behavior one could expect of a man who had unintentionally assaulted and strangled his girlfriend.

Immediately upon realizing he had hurt Guimont, Edge shoved her onto the couch. Rather than checking to see if she was seriously hurt, he yanked the phone from the wall. Although she did not move, he did not check her condition. He left the apartment, still angry, and drove around to "cool down." When he returned to the apartment and found her dead, he packed his belongings, tied Guimont's son's hands and feet, stole her watch and fled to his former roommate's place. Over the next

several hours, appellant made preparations for his trip to Indiana. He waited for his welfare check, cashed it, sold the victim's coat and watch, purchased liquor and spent time driving around and talking with friends. Only when he learned the body had been discovered did he leave town.

Given the lack of direct evidence, appellant's explanation of his actions assumed a critical degree of importance. Indeed the case could be said to turn upon the jury's assessment of Edge's credibility. Great deference must be afforded its judgment in light of the jurys' ability to see and hear the appellant testify.

Based upon the circumstances surrounding the murder, we find that the jury was not unreasonable in finding Edge intended to assault his victim.

## II.

■ We now turn to the question of whether the trial court erred in denying the requested instruction for first degree manslaughter. As articulated in *State v. Leinweber*, the standard used to determine which lesser degrees to submit to the jury is whether the evidence would reasonably support a conviction on the lesser included offense, and at the same time, is such that a finding of not guilty of the greater offense would be justified. 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). Manslaughter in the first degree is defined by Minn.Stat. § 609.20(1) (1984):

> [Whoever i]ntentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances [is guilty of manslaughter in the first degree].

Conviction under the statute requires proof of provocation and intent. The trial court found insufficient evidence of both factors and denied the instruction. Edge himself repeatedly denied that he intended to harm Guimont in any way. Edge testified, "I didn't know I was choking her. * * * I didn't know I had her neck * * *. I was trying to get her to drop the iron

\* \* \*." On cross-examination Edge testified:

Q. You grabbed her by the neck because you wanted to hurt her, didn't you?

A. No, I didn't.

Q. Your intention was to hurt her?

A. No, it wasn't.

Q. Your intention was to frighten her?

A. My intention was for her to drop the iron.

Q. Did you see that she was frightened?

A. I was frightened.

Edge repeatedly denied that he intended to hurt Guimont; denied that he realized that he was hurting her and denied that he had intended to kill her. By his own testimony, Edge did not possess the requisite intent to justify a first degree manslaughter charge. We have previously held that where a defendant maintains that his acts were unintentional, denying a first degree manslaughter instruction is appropriate. *See State v. Lohmeier*, 390 N.W.2d 882, 885 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Oct. 29, 1986).

The trial court also found that Edge lacked the requisite provocation or passion to constitute first degree manslaughter, stating:

[A]n insufficient showing has been made that what transpired, even by defendant['s] own testimony, was such that would provoke a person of normal self-control to such a degree that the law would reduce the defendant's culpability to manslaughter.

Edge testified that he and Guimont had fought repeatedly the day she was killed. During their last fight she threatened to throw his belongings out into the hall while he was gone. She accused him of using her. Edge told Guimont he was leaving her, and as he turned to go, she struck him with an iron. He testified it was a "push-shove blow" that knocked him into the door. "It just stung. It didn't really hurt that bad." No blood was drawn, and the blow did not prevent him from leaving the apartment. Given the evidence and appel-

lant's own testimony we cannot say that the trial court abused its discretion where, by appellant's own testimony, he did not possess the requisite intent or provocation to constitute first degree manslaughter.

DECISION

Affirmed.