**STATE of Minnesota, Respondent,**

**v.**

**Rodney Joseph KOWSKI, Appellant.**

**No. C1–87–1908.**

Court of Appeals of Minnesota.

May 10, 1988.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, Bruce Anderson, Lake County Atty., Two Harbors, for respondent.

Mark C. Weir, Greenberg, Colosimo & Patchin, Ltd., Virginia, for appellant.

Heard, considered and decided by HUSPENI, P.J., and PARKER and MULALLY *, JJ.

## OPINION

MULALLY, Judge.

Rodney Kowski appeals his convictions of theft of over $250 and second degree burglary, Minn.Stat. §§ 609.52, subds. 2(1), 3(2) and 609.582, subd. 2(a) (1986), respectively. He claims (1) the trial court erred by admitting identification testimony against him; (2) the evidence was insufficient to support the two convictions; and (3) the uncompleted structure he allegedly burglarized was not a dwelling.

## FACTS

The crime victim, Steve Schrader, is a professional carpenter living in the Twin Cities. He owns a lot on White Iron Lake, two miles southeast of Ely, Minnesota, upon which he is constructing a vacation home for himself. He began work around

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

1983, and as of spring 1986 he had completed the walk-out basement.

The basement was constructed of block up to ground level with a kneewall framed on top of that. The ceiling and first story floor were completed and Schrader placed tarpaper over the floor to keep the basement dry. The basement door and window frames were completed, although the door and glass window panes had not been installed.

Inside the basement was a working wood stove and a cot. Schrader stored some of his building materials in the basement, including a number of windows, doors and insulation fiberboard. He also stored insulation board outside in the yard. Schrader had slept overnight in this structure in the fall of 1985 when he was hunting.

After working on the structure in the spring of 1986, Schrader did not return to the site until October 4, 1986, at which time he discovered many building materials were missing from both inside and outside the structure. Schrader did his own investigating and soon learned that a neighbor, Jack Chartier, recently had seen two men taking materials from the site.

Chartier related that on the afternoon of September 17 he had seen two men on Schrader's lot loading materials into a pickup truck. Thinking one was Schrader, Chartier had yelled, "Hey Steve!" but got no response. Chartier then drove over to Schrader's lot to investigate.

When Chartier drove up, he saw two men coming out of Schrader's basement. They were approaching a white pick-up truck which Chartier saw had fiberboard insulation in the truck bed. Chartier asked where Schrader was and one of the men said Schrader was not there, but that Schrader had called him and told him to remove the insulation and windows because the roof/floor leaked and the materials would be damaged by the elements. (Schrader denied having ever asked anyone to remove his building materials.) This face-to-face conversation lasted about five minutes.

After hearing this account from Chartier, Schrader went to the homes of some other local residents, including Kowski, to gain more information about the burglary. Kowski allowed Schrader into his house where Schrader noticed that Kowski's new windows matched those which were missing. He also noticed certain fiberboard in Kowski's shed was similar to his missing fiberboard.

Schrader obtained a photograph of Kowski and the next day went to Chartier's house to see if Chartier recognized the photograph. The deputy sheriff, Nick Milkcovich, was already at Chartier's house when Schrader arrived. In Milkcovich's presence, Schrader showed the photograph to Chartier who said he recognized Kowski as one of the men who recently had been loading Schrader's materials into the pickup truck.

Based on Chartier's identification and Schrader's report, Kowski was charged with theft of over $250 and second degree burglary. Kowski moved to suppress any evidence of Chartier's identification, claiming the photographic display (one photo) was impermissibly suggestive and thus created a substantial likelihood of misidentification. He also moved to dismiss the second degree burglary charge, claiming that as a matter of law, Schrader's uncompleted house was not a "dwelling" within the meaning of the statute.

The trial court denied both requests and Kowski was subsequently tried. Chartier identified Kowski in court and also testified about his out-of-court identification. Kowski, however, insisted he was not the man Chartier saw taking Schrader's building materials. The jury found Kowski guilty as charged and convictions were entered for theft of over $250, but less than $2,500, and second degree burglary.

## ISSUES

1. Was the manner of showing Kowski's photograph to Chartier so impermissibly suggestive that it created a substantial likelihood of misidentification?

2. Was the evidence sufficient to support the convictions?

3. Was Schrader's structure a "dwelling"?

## ANALYSIS

■ 1. Evidence of an out of court identification is inadmissible if the procedure used to obtain the identification was so impermissibly suggestive to give rise to a very substantial likelihood of misidentification. *See Neil v. Biggers,* 409 U.S. 188, 196–198, 93 S.Ct. 375, 380–381, 34 L.Ed.2d 401 (1972) (refining the standard set forth in *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). First, the trial court must determine if there was an unnecessarily suggestive photographic display which led to the identification. *See State v. Brouillette,* 286 N.W.2d 702, 706 (Minn.1979). If the trial court finds the display was suggestive, it then must determine whether the display gave rise to a very substantial likelihood of misidentification. *See Neil,* 409 U.S. at 199, 93 S.Ct. at 382. The trial court's findings on these issues are based on the totality of circumstances and will not be set aside unless clearly erroneous. *See id.*

■ Showing Chartier only one photograph was an unnecessarily suggestive photographic display. *See State v. Marhoun,* 323 N.W.2d 729, 733 (Minn.1982) (identification procedure where a witness was shown only one photograph was unnecessarily suggestive). The second question then is whether there was a very substantial likelihood of misidentification. *Neil,* 409 U.S. at 196–198, 93 S.Ct. at 380–381. The factors to be considered are:

(1) The opportunity of the witness to view the criminal at the time of the crime.

(2) The witness' degree of attention.

(3) The accuracy of the witness' prior description of the criminal.

(4) The level of certainty demonstrated by the witness at the confrontation.

(5) The length of time between the crime and the confrontation.

*Id.* at 199, 93 S.Ct. at 382.

■ We find there was no substantial likelihood of misidentification in this in-

stance. Chartier had ample opportunity to view Kowski during their five minute face-to-face conversation with each other. In addition, as there was only a three week period between this conversation and Chartier's identification, Kowski's face would have been relatively fresh in Chartier's memory.

2.

In reviewing a claim of insufficiency of the evidence, we are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

*State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978) (citations omitted).

Kowski claims the state relied on circumstantial evidence and that the evidence was insufficient to convict him. He points out that "a conviction upon circumstantial evidence cannot be sustained, against the presumption of innocence, unless the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt." *State v. Kotka,* 277 Minn. 331, 334, 152 N.W.2d 445, 448 (1967), *cert. denied,* 389 U.S. 1056, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968).

■ This argument is unconvincing as there was substantial *direct* evidence, namely Chartier's identification, to support the conviction. Consequently, assuming the jury believed the state's witnesses and disbelieved contradictory evidence, the jury could reasonably have found Kowski guilty. *See Merrill,* 274 N.W.2d at 111.

3. A "dwelling" is "a building used as a permanent or temporary residence." Minn.

Stat. § 609.581, subd. 3 (1986). Kowski asserts that although the structure could have been a temporary residence when Schrader stayed there during his hunting trip, it ceased to be a residence when Schrader left and returned to his permanent residence in the Twin Cities.

■ No Minnesota appellate court has construed the new definition of dwelling which was introduced in the 1983 burglary law revision. *See generally* 1983 Minn. Laws ch. 321. In determining legislative intent in providing the new definition, we must consider, among other factors, the circumstances under which the law was enacted. Minn.Stat. § 645.16(2) (1986).

From a thorough review of all legislative proceedings leading to passage of Chapter 321, it is clear the legislature intended to upgrade the burglary of an unoccupied dwelling to a more serious offense than the burglary of a non-residential building. (Previously, the law made no distinction, in most cases, between the burglary of unoccupied dwellings and non-residential buildings. Minn.Stat. § 609.58, subd. 2(3) (1982), *repealed by* 1983 Minn.Laws ch. 321, § 4.) Testimony and discussion at the committee and subcommittee hearings centered around the need to preserve the privacy and security of the home, a place above all others where one needs to feel both person and property are safe. *See Hearing on S.F. 483 before the Senate Judiciary Committee,* 73d Legislative Sess. (April 22, 1983); *Hearings on S.F. 483 before the Criminal Law Division of the Senate Judiciary Committee,* 73d Legislative Sess. (April 13 and April 15, 1983); *Hearing on S.F. 435 before the House Judiciary Committee,* 73d Legislative Sess. (April 8, 1983); *Hearings on H.F. 32, 435, 707 before the Criminal Justice Division of the House Judiciary Committee,* 73d Legislative Sess. (March 23 and March 30, 1983). Legislators were deeply concerned about the distress and lingering fear experienced by residential burglary victims who no longer felt secure in their own homes. *See id.* It was also noted that unlike many commercial buildings, residences often have no security systems and

are thus easily penetrable. *See Hearing on H.F. 435 before Criminal Law Division of House Judiciary Committee* (March 30, 1983). Consequently, the legislature increased the relative severity for the burglary of a dwelling with the intent of deterring residential burglaries.

Although there was a consensus to upgrade the relative severity level for residential burglaries, debate arose over whether the legislation should include all residences or only permanent residences. Those proposing that both temporary and permanent residences be included asserted that victims' feelings of apprehension and personal violation were just as real and intense whether the burglary occurred at their year-round home or their vacation home. *See Hearings on H.F. 32, 435, 707 before the Criminal Justice Division of the House Judiciary Committee* (March 23, 1983). These proponents also believed that creating a permanent versus temporary distinction would lead to frequent and unnecessary litigation of the distinction, which would ultimately result in arbitrary and inconsistent levels of conviction. *See id.; Hearing on H.F. 435 before the Criminal Justice Division of the House Judiciary Committee* (March 30, 1983); *Hearing on S.F. 483 before the Criminal Law Division of the Senate Judiciary Committee* (April 13, 1983).

Opponents asserted that including temporary residences in the higher severity level would result in more incarcerations than the correctional facilities could accommodate. Opponents also argued that so-called "cabin kick-ins" were not as egregious as burglaries of permanent residences. The opponents' proposal to distinguish between temporary and permanent residence was defeated at the subcommittee level and was not considered again. *See Hearing on H.F. 435 before the Criminal Justice Division of the House Judiciary Committee* (March 30, 1983); *Hearing on S.F. 483 before the Criminal Law Division of the Senate Judiciary Committee* (April 13, 1983). The law in its current form, which does not distinguish between permanent and temporary residences, passed by unanimous vote in both houses.

In light of the legislative concerns underlying the current law, we believe Schrader's structure remained a temporary residence for burglary purposes even after he returned to his permanent residence in the Twin Cities. An owner's intent to return to a dwelling is the crucial factor in determining whether a structure retains its character as a dwelling in the owner's absence. *See* 12A C.J.S. *Burglary* § 29 (1980). Regardless of the length of time an owner is absent from the structure, it remains a dwelling if the owner does not intend to permanently abandon it. *See id.*

Because the legislature intended to treat temporary and permanent residences similarly, this well-settled principle concerning an owner's intent to return to the dwelling should apply to temporary residences just as it applies to permanent residences. Therefore, Schrader's structure retained its character as a temporary residence because, at the time of the burglary, Schrader still had the intent to return and use it as a temporary residence.

We should also note that the Criminal Justice Division of the House Judiciary Committee considered an amendment which would have made it a lesser offense to burglarize a residence which had not been occupied for the previous 30 days. The amendment was proposed to apply to "cabin kick-ins" where the owners had left for the season. The amendment's opponents asserted that the provision would lead to arbitrary distinctions between severity levels. They also believed a residential burglary would still have the same long-term effects on victims regardless of the length of time they had been absent from the residence before being burglarized. *Hearing on H.F. 435 before the Criminal Justice Division of the House Judiciary Committee* (March 30, 1983). Because this amendment was defeated in subcommittee after only a short discussion, *see id.,* we believe the legislature did not intend that a structure lose its residential character simply because it is vacant for a certain period of time before the burglary. *See* 12A C.J.S. *Burglary* § 29. ("[L]apse

of time alone is insufficient to change the character of the house where the owner has a fixed intention of returning.")

## DECISION

The trial court's judgments of conviction for theft of over $250 and second degree burglary are affirmed.

Affirmed.